Receipt No. LU008373

ORIGINAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# LUBBOCK DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 FEB 29  PM 1:36

DEPUTY CLERK _____

**GERARD N. MATZEN,**
**TEXAS CIVIL COMMITMENT CENTER**
**2600 S. SUNSET DRIVE**
**LITTLEFIELD, TEXAS 79339**
            **PLAINTIFF,**

**5-16CV-043-C**

**V**                                    CIVIL ACTION NO. _____

**MARSHA MCLANE IN HER OFFICIAL**
**AND INDIVIDUAL CAPACITY AS EXECUTIVE**
**DIRECTOR, TEXAS CIVIL COMMITMENT OFFICE**
            **DEFENDANT,**

**ERIC TURPIN, MAYOR, CITY OF LITTLEFIELD**
**IS BEING SUED IN THEIR INDIVIDUAL CAPACITY**
**2181 STATE HIGHWAY 2197**
**LITTLEFIELD, TEXAS 79339**
            **DEFENDANT,**

**TEXAS CIVIL COMMITMENT CENTER**
**"TCCC"; CORRECT CARE RECOVERY SOLUTIONS**
**AND**

**TINA KOVAR, FACILITY DIRECTOR**
**IN HER OFFICIAL AND INDIVIDUAL CAPACITY**
**TEXAS CIVIL COMMITMENT CENTER**
**2600 S. SUNSET DRIVE**
**LITTLEFIELD, TEXAS 79339**
            **DEFENDANTS,**

## ORIGINAL COMPLAINT

## JURY TRIAL DEMANDED

### PLAINTIFF'S ORIGINAL COMPLAINT

Comes Now Plaintiff pro se, and brings this civil rights complaint pursuant to 42 U.S.C. Section

1983 against Defendants in either their Official and or Individual Capacities.  Plaintiff respectfully

seeks **Monetary, Prospective, Injunctive and Declaratory Judgment** .

## EXHAUSTION STATEMENT

1. Plaintiff has discharged his sentences and therefore is not on parole. Because Plaintiff is not a prisoner, he does not fall under the Prison Litigation Reform Act (PLRA) concerning exhausting requirements.

## JURISDICTION AND VENUE

2. This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. This Court has jurisdiction under 28 U.S.C. §§ 1331; 1343(a)(1)-(a)(4). This Court has supplemental jurisdiction over Plaintiff's Texas state law claims under 28 U.S.C. § 1367, as the state law claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201 and 2202, and injunctive relief pursuant to 28 U.S.C. §§ 2283; 2284; and Rule 65 of the Federal Rules of Civil Procedure.

3. This Court has jurisdiction over each Defendant, in that the Defendants are either employees or agents of the State of Texas or one its agencies; Texas residents and citizens; or corporations that conduct business in the State of Texas.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)(2) because at least one Defendant is a Texas resident residing in the Northern District.

5. At all times relevant to this complaint, the Defendants were or are officers, employees, contractors, or otherwise agents of the State of Texas, acting in their official capacities under color of state law. The business of these Defendants are conducted in the State of Texas, including the Northern District.

## PARTIES

## PLAINTIFF

6. As an *Outpatient,* Plaintiff Gerard N. Matzen (hereafter "Plaintiff") is involuntarily civilly committed as a *Sexually Violent Predator ("SVP")* and was ordered by a Court with competent jurisdiction, after being decided by a **jury** to submit to **mandatory Outpatient Treatment and Supervision** pursuant to Texas' *Outpatient Sexually Violent Predator Treatment Program ("OSVPTP")* as administered by the Office of Violent Sex Offender Management ("OVSOM"). See Texas Health and Safety Code § 841.081 (West 2011).

7. Upon release from the Texas Department of Criminal Justice-Institutional Division ("TDCJ-ID"), Plaintiff was transported to the Southeast Texas Transitional Center ("STTC"), where he remained confined anywhere from 16 - 24 hours a day, 7 days a week. Although not **totally free ,** Plaintiff did not experience *total confinement* while confined at the STTC.

8. On September 10, 2015, Plaintiff was escorted by the State Police and transported by bus, to the Texas Civil Commitment Center, located in Littlefield, Texas and thereafter unlawfully placed in *total confinement.*

9. Plaintiff has been legislatively and judicially declared as an **Outpatient ,** but remains confined at the "TCCC" operated by Correct Care Recovery Solution. The facility is a high security prison, behind double razor topped wired fencing, including fenced in walkways, equipped with security cameras and motion detectors. Although Plaintiff has a Global Positioning Satellite tethered to his ankle, Plaintiff is escorted everywhere by a security monitor and is under constant surveillance of security cameras.

10. Plaintiff is being forced by Defendant McLane to reside at the current address; Texas Civil Commitment Center, 2600 S. Sunset Dr., Littlefield, Texas 79339.

## DEFENDANTS

11. Defendant Marsha McLane is the Executive Director for the Texas Civil Commitment Office ("TCCO") and is responsible for the overall daily administration and operation of the Texas Civil Commitment Office. Defendant McLane is being sued in her Official and Individual Capacity.

Defendant McLane is an employee and agent to the State of Texas, she may be served with legal notice of this suit by service of Complaint and Summons on the Secretary of State pursuant to Rule 4(e)(1) of the Federal Rules of Civil Procedure, and in accordance with §§ 17.026(a); 101.102 of the Texas Civil Practice and Remedies Code.

12. Tina Kovar is the Facility Director of the TCCC. Defendant Kovar is responsible for the day to day operations of the Facility and is being sued in her official and individual capacity involving Plaintiff's unlawful confinement and unconstitutional living conditions. Defendant Kovar can be served at Texas Civil Commitment Center, 2600 S. Sunset Dr., Littlefield, Texas 79339 or through Correct Care Recovery Solutions 1283 Murfeeboro Pike, Suite 500 Nashville, Tennessee 37217 (Home Office).

13. Eric Turpin is the Mayor for the City of Littlefield, as Mayor, Defendant Turpin is responsible for all lawful and unlawful conduct that occurs in and throughout the City of Littlefield involving all of it's citizens. The City of Littlefield are the proud owners of the Texas Civil Commitment Center, that currently has Plaintiff and other civilly committed *outpatients in captivity*. Defendant Turpin was fully aware that SVPs were challenging their unlawful confinement via litigation in federal courts, but chose to unlawfully confine Plaintiff and other SVPs. The City of Littlefield is being sued in its Individual Capacity. The City of Littlefield can be served at 2181 State Highway 2197, Littlefield, Texas 79339.

14. The Texas Civil Commitment Office (Defendant McLane) and the Texas Civil Commitment Center (Defendant Kovar) imposes and enforces rules and living conditions that substantially restrict all of Plaintiff's liberty interests and subject him and other SVP to punishment under the auspices of the civil commitment statutes. TCCO and TCCC deprives Plaintiff of his civil rights without due process of law, violate equal protection, privacy, speech and unlawfully confines. The above actions do not comport with the Fourteenth Amendment of the United States Constitution where those involuntarily civilly committed are concerned.

15.  At all times relevant herein, the Defendants, and all of them, acted under color of state law and their conduct as described herein was within their official capacities with the requisite state action. In depriving Plaintiff of his rights, and privileges secured under both Federal and State Constitutions, the Defendants, and all of them, acted willfully and maliciously, with reckless and callous indifference to Plaintiff's state and federally protected rights.

## INTRODUCTION

16.  Plaintiff is a Texas resident and is one of more than 350 men that have been civilly committed as an SVP under Texas Health & Safety Code Chapter 841.

17.  The Defendants are responsible for the selection, housing, supervision, care treatment, and nearly every aspect of the Plaintiff's life while he is civilly committed.

18.  Plaintiff request this Honorable Court to appoint an attorney to assist him with this complaint because he is unable to (1) hire an attorney; (2) has no access to an adequate law library that will allow him to conduct further research, and thereafter file the necessary pleadings to support this complaint; (3) Plaintiff has no ability to independently appear in court for proceedings as he is in the  physical custody of Correct Care Recovery Solutions at the insistence of Defendant McLane; (4) Plaintiff has no way of conducting investigations and contacting witnesses; and (5) he has no ability to serve papers.

## CIVIL COMMITMENT BACKGROUND FACTS

19.  The Legislature first enacted Chapter 841 of the Texas Health & Safety Code in 1999, finding that there was a "small but extremely dangerous group of sexually violent predators" who suffered from a "behavioral abnormality" that made them "likely to engage in repeated predatory acts of sexual  violence." Tex. Health & Safety Code Ann. § 841.001 (West 2010). The Legislature determined that it was in the interest of the state to establish a "civil commitment procedure for the long-term supervision and treatment" of those deemed to be sexually violent predators. Id. At the time of its enactment, individuals committed into the civil commitment program were placed in an

outpatient treatment and supervision program, and their commitment was to continue until the

person's behavioral abnormality has changed to the extent that the person is no longer likely to

engage in a predatory act of sexual violence. Act of May 30, 1999, 76th Leg., R.S., ch. 1188, §

4.01, 1999 Tex. Gen. Laws 4122, 4147 (amended 2003, 2015) current version at Tex. Health &

Safety Code Ann. § 841.081) (West, Westlaw through 2015 R.Sess.).

20.  In order to identify those individuals who might be in need of such supervision and treatment,

the Code required a repeat sexually violent offender who was being released from prison  to be

assessed to determine if he suffered from a "behavioral abnormality" that would make him "likely

to engage in a predatory act of sexual violence." Act of  May 30, 1999, 76th Leg., R.S., ch. 1188,

§ 4.01, 1999 Tex. Gen. Laws 4122, 4146 (amended 2003, 2011, 2015) (current versions at Tex.

Health & Safety Code Ann. § 841.023 (West, Westlaw through 2015 R. Sess.).  If so identified,

the State was given the authority to file a petition seeking to make the individual the subject of

"civil commitment," and the individual was then entitled to a jury trial on the issue of whether he

was a sexually violent predator.  Act of May 30, 1999, 76th  Leg., R.S., ch. 1188, § 4.01, 1999

Tex. Gen. Laws 4122, 4146-47 (amended 2003, 2007, 2015) (current versions at Tex. Health &

Safety Code Ann. §§ 841.041, 841.061) (West, Westlaw through 2015 R. Sess.).  See Mitchell v

State, No. 08-13-00241-CR.

## FACTS SPECIFIC TO PLAINTIFF

21.  Plaintiff was convicted of multiple offenses involving his sexual misconduct and was identified

as a candidates for the civil commitment program upon his release from prison.  After a jury trial,

Plaintiff was determined as sexually violent predator in need of supervision and treatment, and

thereafter the trial court entered a Final Judgment and Order of Civil Commitment, (See Exhibit

"A") committing Plaintiff into outpatient treatment and supervision, as was required by § 841.081

of the Tex. Health & Safety Code at that time.

22.  Plaintiff was released from prison on July 3, 2014 and placed into the physical custody of

OVSOM/TCCO to start the Outpatient Sexually Violent Predator Treatment Program ("OSVPTP"). Plaintiff was transported to Harris County, Texas to be confined at the Southeast Texas Transitional Center ("STTC"), a facility under contract with the Texas Department of Criminal Justice-TDCJ-ID.

23.  Plaintiff's Final Judgment Ordered him into "Outpatient Treatment" which at the time was the Texas Outpatient Sexually Violent Predator Treatment Program ("OSVPTP") prior to the June 17, 2015 enacted amendments to Texas Health & Safety Code Chapter 841.

24.  Plaintiff's Orders of Civil Commitment specifically required him to comply with all civil commitment requirements delineated in Tex. Health & Safety Code § 841.082(a).  The requirements pursuant to § 841.082(a) at that time consist of: (1) requiring the SVP to live in a particular location; (2) prohibiting contact between the SVP and victims or potential victims; (3) prohibiting the SVP's use of alcohol, inhalants, or controlled substances; (4) requiring participation in and compliance with a particular course of treatment; (5) requiring the SVP to submit to tracking and refrain from tampering  with tracking equipment; (6) prohibiting the SVP from changing residence without prior authorization; and (7) any requirements determined necessary by the judge. See In Re Commitment of Fisher, 164 S.W.3d 637, 641 (Tex. 2005).

25.  The *newly enacted amendment S.B. 746* to Tex. Health and Safety Code Section 16, 40(b) specifically required *a* Court with competent jurisdiction to modify Plaintiff's former Order of Commitment to comply with the *amended version of § 841.082*.  See Exhibit "B" (Senate Analysis to S.B. 746).

26.  Defendant McLane's post-enactment implementation of placing Plaintiff in total confinement has expanded the disabilities and restrictions of the Plaintiff's Final Judgment and Order of Commitment.

27.  As an *Outpatient,* Plaintiff is currently being unlawfully confined in the Texas Civil Commitment Center "TCCC".

28.  The facility is a high security prison, behind double razor topped wired fencing, including

fenced in walkways, equipped with security cameras and motion detectors. Although Plaintiff has a Global Positioning Satellite tethered to his ankle, Plaintiff is escorted everywhere by a security monitor and is under constant surveillance of security cameras.

29.   Plaintiff is required to share a cell with another individual, that is just as small, if not smaller than his cell while in prison.   Plaintiff is being forced to sleep on steel bunks just like prisoners. Plaintiff, like a prisoner is not afforded privacy while utilizing restroom.   When the issue was brought to the attention of the Administration, Plaintiff was told "You guys should already be use to this after spending years in prison".

30.   Plaintiff's living area is surrounded with surveillance cameras mounted on the walls within a dayroom and a portion of the living area (dormitory 14 man area).

31.   Plaintiff's access to daily outside recreational activities have diminished significantly more than when he was in the "STTC" and prison.   Plaintiff is not permitted night time recreational activities. Plaintiff is not a prisoner and therefore is being denied the "*civilized measures of life necessities*" that are automatically guaranteed to a prisoner.

32.   Plaintiff while in *total confinement* is being denied *Outpatient Sex Offender Treatment,* which is necessary for the purpose of changing his behavioral abnormality.

33.   On information and belief the Texas Civil Commitment Center does not have qualified licensed sex offender therapists available to provide Plaintiff with the appropriate "outpatient" sex offender treatment mandated by the Texas Legislature and his Final Judgment.   On information and belief, not one therapist has displayed a license to practice as required by the Council On Sex Offender Treatment.

34.   Plaintiff while in *total confinement* is being denied access to courts.   The law library that currently exists does not have any law books, the software for Lexis Nexis is not updated, and there is no one positioned in the Unit Law Library to provide assistance.

35.   Plaintiff is a veteran and receives military retirement pay.   Plaintiff is being forced to pay 33

and 1/3% of his military retirement for housing, treatment, and GPS fees. Whereas, at the time of his civil commitment, Texas Health & Safety Code § 841.146(c) required the State to pay all costs.

36. As an "outpatient, Plaintiff and other veterans due to their *total confinement* within the TCCC are being refused medical assistance by the Veteran's Administration.

37. Prior to being placed in *total confinement,* Plaintiff while in Houston, Texas could schedule his own visits with the V.A. as needed.

38. Plaintiff, while in *total confinement* is being required to pay the State for treatment and housing. 39. On information and belief, if Plaintiff does not pay cost for treatment, housing, and GPS fees, Plaintiff will remain at the Texas Civil Commitment Center until all bills are paid in full.

40. Plaintiff upon entering into Texas' *Outpatient Sexually Violent Predator Treatment Program*, entered into a *contractual agreement* with the State of Texas for *Outpatient Treatment*.

## CONDITIONS OF CONFINEMENT

41. The facility is a high security prison, behind double razor topped wired fencing, including fenced in walkways, equipped with security cameras and motion detectors. Although Plaintiff has a Global Positioning Satellite tethered to his ankle, Plaintiff is escorted everywhere by a security monitor and is under constant surveillance of security cameras.

42. In comparison with the Texas Department of Criminal Justice-Institutional Division ("TDCJ-ID"), the Texas Civil Commitment Center has a ranking system as its hierarchy that Plaintiff and other residents must recognize.

43. In a similar fashion to TDCJ-ID, the facility staff conducts secure ingress and egress; daily random searches of all residents, as well as their property; and conducts several "counts" (counts consist of all residents returning to their cells and remain there until staff verifies facility count), within a 24 hour period.

44. Plaintiff contend that the "restrictive and denigrating conditions" at the "TCCC" denies Plaintiff of Substantive Due Process. Plaintiff offers that his Final Judgment and Order of

Commitment does not permit Defendant McLane to place him in a facility that subjects him to further "confinement".

44. By being placed in the "TCCC", Plaintiff is being stripped of his liberty interest in his movement and personal security.

45. Plaintiff offers that the conditions of confinement are unconstitutional and inadequate, to the point where residents are forced to live in squalid conditions that are inhumane and pose a serious health risk. Residents are exposed to a shower area that is constantly filled with large stagnant water puddles due to improper drainage. The showers and shower area are not properly cleaned on a daily basis. The Administration refuse to provide the appropriate chemicals and equipment necessary to clean the showers. Residents are constantly exposed to others that suffer from Staphylococcus and use the very same showers and tables within the general living area, without the Defendants taking the appropriate measures in making sure that Plaintiff's and other residents' health are not at risk.

46. Plaintiff is confined due to the Defendants' affirmative exercise of their power to restrain Plaintiff's liberty, to the point that it renders him and other residents unable to care for themselves, and at the same time fails to provide them with the basic human needs such as proper food, shelter, medical and reasonable safety.

47. Plaintiff, as well as other residents are denied medical and dental care by Defendants in their custody and care. The Defendants have made it clear that Plaintiff, as well as other residents must pay for their own specialty, major emergency care, and medications. See Exhibit "C" (Civil Commitment Center For Violent Sex Offenders Response to Vendors Questions 8, 20, 24, 37, 38, 39, 48, and 60 ).

48. Prior to Plaintiff and other residents being placed in *total confinement,* as *Outpatients,* they scheduled their own medical appointments with the V.A. or various other medical institutions in Harris County, Texas with little or no fee charged at all for services.

49. Plaintiff, as well as other veterans are no longer provided services with the V.A. due to being placed in *total confinement*.

50. On information and belief, the Veteran's Administration is refusing to provide services for those that are in *total confinement*.

51. On information and belief, civil commitment residents while out on medical appointments are denied their physician-patient confidentiality.  Correct Care Recovery Solutions has a policy practice and procedure that denies a resident this right.  Prior to being placed in *total confinement* Plaintiff's right to physician-client confidentiality was never violated.

52. Plaintiff is forced to eat the food served to him at the TCCC.  He is not free to buy fresh groceries from the store, or to cook food of his choosing.  The food at the TCCC is served in insufficient quantity, and the quality of the food is poor.  Meat is highly processed, and meals are primarily carbohydrates.  Residents in civil commitment are so hungry that those who have money are compelled to supplement their diets with high price foods from an outside commissary vendor chosen by TCCC; while men in civil commitment without money go hungry.  The food is not of a sufficient quantity to meet the daily nutrition scale established by Dietary Guidelines For Americans, United States Department of Agriculture, and United States Health Department of Health and Human Services.  Residents at the TCCC vary in ages and size, at a bare minimum the calories count should be  2,400-2,600.  The TCCC boost the total calories of a meal served by providing sugar packets or Margarine with the food.

53. The food is always at or below room temperature when served to the residents.  There are times when the food is so cold, it is not eatable.  On information and belief, there is no remedy for this situation.

54. Plaintiff, as well as other residents are being denied recreation.  While in *total confinement,* recreation is basically offered when facility staff feels like calling it.  Residents are forced to spend a great deal of their time in the building.  Within a 24 hour period, outside recreation may be called

for a total of four hours.  Residents are being denied outside recreation during night time hours, this is worse than prison.  Prisoners are granted night time recreation on a daily basis.  The TCCC has lights, surveillance cameras, and has double razor topped wired fencing to keep residents within the facility. Plus, Plaintiff as well as other residents have GPS Monitors tethered to their ankles for constant monitoring.

55.  Plaintiff, as well as other residents are denied access to courts.  The law library within the facility is inadequate for an individual to conduct the appropriate research that is needed to articulate claims and thereafter support their claims with relevant case law.  Although Lexis Nexis is provided, it is behind three months.  Furthermore, the law library has no legal books at all in which to introduce an individual to research.  There is no law library clerk, or a person skilled in law to assist a resident in filing a lawsuit or conducting research.  Although, the computers within the law library are equipped with Internet, Plaintiff is prohibited from using it.

56.  Without adequate access to courts, Plaintiff and other residents will not be able to effectively challenge the validity of their civil commitment, conditions of their 'unlawful" confinement, and the manner in which their Biennial Review are conducted.

57.  On information and belief, residents while confined within the "STTC" were permitted to go to the  Harris County Law Library in Houston, and while there they had total access, including the Internet.

58.  As an "outpatient" unlawfully confined, Plaintiff's civil rights to free speech and free association with any person in the "free world" is denied, unless first approved by a case manager. Purportedly, the civil commitment law in Texas has changed in regards to an SVPs' contact.

59.  Plaintiff as an "outpatient" while in *total confinement* is being required by Defendants to pay 33 and 1/3% of any money received, whether it be from Plaintiff's retirement, or his family and friends.  Defendants have.  This payment is imposed upon Plaintiff and other civilly committed clients even if they need the money to pay for medical bills, prescriptions, hygiene or food items.

60.  On January 12, 2016, TCCO representative Deputy Director Drake and Amy Goldstein,

Clinical Director for Correct Care Recovery Solutions, specifically stated "If residents do not pay

their assessment fees, they will not progress in treatment, nor will they go home.

61.  Plaintiff, as noted through Exhibit "A", In Re Commitment of Fisher, 164 S.W.3d 637 (Tex.

2005) and former Texas Health and Safety Code § 841.081(a) has been judicially and legislatively

declared as an "outpatient", and was excluded from paying for treatment and housing.

62.  Plaintiff, as an **outpatient** while totally confined, is being required to wear a GPS monitor

tethered to his ankle.  Plaintiff offers that this is an unlawful and unnecessary restraint while in *total*

*confinement*, and does not comport with the Due Process Clause of the Fourteenth Amendment.

63.  Plaintiff and other clients are being subjected to constant and continuous confinement upon

release from TDCJ-ID.  For example, Plaintiff discharged his prison sentence on July 3, 2014.

However, Defendant McLane has specifically required further confinement.

64.  On information and belief, the Defendants, including all of them, have policies, practices and

procedures of unlawfully confining an SVP that has been granted **outpatient treatment** and this

violates Article I, Section 16 of the Texas Constitution, and the Due Process Clause of the

Fourteenth Amendment to the United States Constitution.  Due to Plaintiff and other residents being

held in captivity, they are being deprived of life and liberty.

65.  The Defendants have conspired to place Plaintiff and other civilly committed SVPs in the

"TCCC", which represents an "atypical and significant hardship' on an SVP client that has been

Ordered into outpatient treatment.  The Defendants knew or should have known that the *newly*

*enacted Amendment S.B. 746, Sec. 40(b)* did not authorize for Defendants to place Plaintiff and

other civilly committed SVPs into captivity.

66.  Plaintiff is not *challenging the Court's Final Judgment nor is he seeking release* from civil

commitment; Plaintiff, specifically challenges Defendant McLane's unconstitutional application of

the *newly enacted Amendments* to Tex. Health and Safety Code Chapter 841.

67. Plaintiff, in the alternative, challenge that the *newly enacted amendments* to Tex. Health and Safety Code, Chapter 841 is unconstitutional *as applied* to an SVP that has been legislatively and judicially deemed as an **outpatient**.

## CAUSATION

68. Defendant McLane is not a mental health professional or an attorney, and cannot ensure that Plaintiff is afforded constitutionally adequate conditions of confinement and sex offender treatment to change his behavioral abnormality. Prior to this complaint, Defendant McLane had the authority and duty to afford Plaintiff constitutionally adequate *outpatient treatment.*

69. Defendant McLane has policies, practices, and procedures that allow the continuous confinement of an SVP that has discharged his entire sentence.

70. Defendant McLane has a policy, practice and procedure that requires Plaintiff and other SVPs to pay 33 1/3% of their gross income, for housing, treatment, and Global Positioning Monitor fees while in *total confinement.* Plaintiff was committed prior to the change in law on June 17, 2015, and is therefore not required to pay such fees. See Exhibit See Exhibit "D" Monthly Income & Expense Worksheet and Exhibit "E" Resident Bank Trust Fund Withdraw Forms (January & February).

71. On information and belief, Defendant McLane and Texas Civil Commitment Center (Clinical Director Amy Goldstein) have a policy, practice and procedure that denies Plaintiff's and other SVPs the right to advance in treatment, or released from civil commitment if they do not pay.

72. Defendant Kovar, Facility Director of the Texas Civil Commitment Center is not a mental health professional or an attorney, and cannot ensure that Plaintiff is afforded constitutionally adequate sex offender treatment.

73. Defendant Kovar does not provide constitutionally adequate conditions of confinement; Plaintiff, as well as other residents are exposed to conditions that are detrimental to their health and safety. Several residents have contracted Staphylococcus within the facility, and Director Kovar

has not developed an appropriate regiment on how the facility will be maintained and the residents properly protected from diseases.

74. Defendant Kovar denies Plaintiff and other civilly committed SVPs medical and dental services. Plaintiff as well as other SVPs are required to pay for all dental services except for the pulling of teeth. SVPs are not provided routine teeth cleaning, fillings, or cosmetic surgeries, without having to pay an exorbitant fee. Svps are required to pay for all medical emergencies, specialty care and all medications. Residents that cannot afford to pay for emergency medical care, specialty care, or special medications will be forced to suffer and go without. This clearly violates the evolving standards of decency.

75. Defendant Kovar has a policy, practice and procedure that calls for the confiscation of Plaintiff's property, such as Texas Identification Card; all credit cards, and checks. Prior to Plaintiffs arrival to the TCCC, Plaintiff was able to pay for all expenses and including his bills. Plaintiff owns property and is required to pay bills in a timely fashion. Plaintiff risks the possibility of losing his property due to not being allowed access to his property.

76. Defendant Kovar has a policy, practice and procedure that violates Plaintiff's and other civilly committed SVP's right to privacy and physician-patient confidentiality. Plaintiff, and other SVPs are denied the right to visit with outside medical doctors or medical care personnel, without employees of the TCCC interfering. Director Kovar's policy calls for TCCC employees to be present in the doctor's office with the client while receiving treatment at all times.

77. Defendant Kovar has a policy, practice and procedure that requires the unlawful confinement of an SVP that has been legislatively and judicially mandated as an *outpatient*.

78. Defendant Eric Turpin, Mayor of the City of Littlefield, has a policy, practice, and procedure that requires Plaintiff and other SVPs to remain unlawfully confined at the TCCC. While confined in the City of Littlefield, Plaintiff and other civil commitments are forbidden to enter into the City of Littlefield to register as sex offenders and to acquire Texas Identification Cards as requried by

Chapter 62, Texas Code of Criminal Procedures, and are being denied the right to vote.  See

Exhibit "F" The Texas Photo Identification Law.

80.  The Defendants, and all of them, are requiring Plaintiff and other civil commitments to vote in

absentee under the status *confinement in jail,* when in fact it violates the Texas Election Code.

Plaintiff and other civil commitments do not possess the status to vote under the *confinement in jail*

criteria.  See Exhibit "G" Application For Ballot By Mail & Texas Election Code § 82.004

*Confinement in jail.*

81.  Defendant Turpin, and Correct Care Recovery Solutions (Texas Civil Commitment Center)

have conspired with Defendant McLane to unlawfully confine Plaintiff and other civil commitments

that have been deemed  **outpatients .**

80.  On information and belief, Defendant McLane has a policy, practice, and procedure that

subjects Plaintiff and other civil commitments to polygraph and plethysmograph testing, which

violates Plaintiff's First, Fourth, and Fourteenth Amendment to the United States Constitution.

## LEGAL CLAIMS

**Violation of Substantive Due Process:**

(1) Defendant McLane, knowingly through policies, practice and procedures violated clearly

established law that was well settled at the time of this complaint, failed to provide Plaintiff and

other civil commitments constitutionally adequate conditions and **outpatient sex offender**

**treatment.**

(1) Defendants McLane, Kovar ("TCCC"/Correct Care Recovery Sollutions) on a continuing basis

violates Plaintiff's substantive due process rights under the Fourteenth Amendment.  Defendant

McLane applies the *newly enacted* amendments to Tex. Health & Safety Code Chapter 841, in a

manner that results in Plaintiff and other civil commitments being unlawfully confined.  The

Defendants knew or should have known that subjecting Plaintiff and other civil commitments to

unconstitutional punishment violates the substantive due process clause to the Fourteenth

Amendment to the United States Constitution.

(2) Defendant McLane fails to provide **outpatient treatment** in violation of the Fourteenth Amendment to the United States Constitution.

(2)(a) Defendant McLane fails to provide treatment in violation of the Texas Civil Commitment "Act", Tex. Health & Safety Code Chapter 841.

(3) Defendants McLane, Kovar, and Turbin denies Plaintiff and other civil commitments the right to be free from punishment in violation of the Fourteenth Amendment to the United States Constitution and Texas Constitution.

(3)(a) Defendant McLane denies Plaintiff and other civil commitments the right to *Less Restrictive* housing in violation of the Fourteenth Amendment to the United States Constitution and the Texas Constitution.

(3)(b) Defendant McLane denies Plaintiff and other civil commitment the right to be free inhumane treatment in violation of the Fourteenth Amendment to the United States Constitution.

(3)(c) Defendant McLane unreasonably restricts Plaintiff and other civil commitments free speech and free association in violation of the First and Fourteenth Amendment to the United States Constitution. Defendant McLane has a policy, practice and procedure that disallows Plaintiff and other civil commitments their rights to make contact with persons in the free world, without first obtaining approval. Defendant McLane's policy, practice and procedure also disallows Plaintiff and other civil commitments to vote.

(4) Defendant Turbin, knowingly allowed Plaintiff and other civil commitments to be unlawfully confined in the City of Littlefield. Defendant Turbin has a policy, practice and procedure for Plaintiff and other civil commitments to remain confined in the TCCC, and not be allowed in the City of Littlefield to register as sex offenders, to obtain Texas Identification or to vote in local, state, and federal elections.

(4)(a) Defendant Turbin at the time of entering into an agreement with Defendants McLane and

Correct Care Recovery Sollutions ("TCCC") to unconstitutionally confine Plaintiff, in the City off

Littlefield, knew or should have known that Plaintiff, by law had a constitutional right to **genuine**

**outpatient treatment and conditions.**

(4)(b) The Defendants knowingly house Plaintiff and other civil commitments in the "TCCC" which

is not an **outpatient** facility.  This confinement is arbitrarily and materially alters the **outpatient**

nature of civil commitment under Texas House & Safety Code Chapter 841 without due processs

under the Fourteenth Amendment to the United States Constitution.

**RELIEF REQUESTED**

**WHEREFORE PREMISED CONSIDERED,** Plaintiff respectfully pray this this Honorable

Court grant the following relief that:

1.  As applied, and used by Defendants, that Texas Health & Safety Code § 841.082(a) is

constitutionally invalid in that it is punitive and violates Plaintiff's and other civil commitments

**Final Judgments.**

2.  The Defendants fail to provide Plaintiff and other civil commitments their substantive due

process rights to constitutionally adequate sex offender treatment as required, and therefore

declartory judgment is sought.

**THE AWARD OF COMPENSATORY DAMAGES IN THE FOLLOWING AMOUNTS**

$500,000 against Defendant McLane for failing or refusing to provide Plaintiff constitutionally

adequate **outpatient sex offender treatment** as required by due process, and for failing to provide

Plaintiff with **genuine outpatient conditions** as required.

$500,000 against Defendant McLane for causing the constant and continuous unlawful confinement

of Plaintiff after July 3, 2014, where Plaintiff had discharged a sixteen year sentence prior to being

released from *prison.*

$500,000 against Defendant Turpin (City of Littlefield) for causing the unlawful confinement of

Plaintiff in the "TCCC" since September 10, 2015, by conspiring with Defendants McLane, and

"TCCC" (Correct Care Recovery Solutions ) to unlawfully confine and restrict Plaintiff in his movements.

## THE AWARD OF PUNITIVE DAMAGES IN THE FOLLOWING AMOUNTS

$500,000 each against Defendants McLane, Kovar ("TCCC"/Correct Care Recovery Solutions) and Turpin (City of Littlefield) for subjecting Plaintiff to the "restrictive and denigrating" conditions of confinement that are punitive in nature and violative of the Fourteenth Amendment to the United States Constitution.

Plaintiff further pray that this Honorable Court grant any other releif that it deems appropriate.
So prayed on this the 21st, February, 2016..

Respectfully Submitted:

Gerard N. Matzen
Texas Civil Commitment Center
2600 S. Sunset Dr.
Littlefield, Texas 79339

## UNSWORN DECLARATION

I have read the foregoing complaint and hereby verify the matters alleged herein are true and correct to the best of my knowledge and belief.  As to matters alleged on information and belief, I believe them to be true.  I hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746,  that the foregoing is true and correct.

Executed on this the 21st day of February, 2016.

Gerard N. Matzen
Plaintiff

February 21, 2016

Clerk of Court
U.S. District Court Northern District
Lubbock Division
1205 Texas Ave Room 209
Lubbock, Tx. 79401

Dear Clerk,

Please find enclosed an Original and one copy of Plaintiff's § 1983 Complaint and Motion to Order Service on Defendants. I would appreciate it very much if this matter was brought before the Court at your earliest convenience.

If Plaintiff is required to pay for having the Defendants served, please advise as to the procedures. Thank you very much for your time and service.

Sincerely,

Gerard N. Matzen
Plaintiff



FEB 2 9 2016

*Exhibit  "A"*

JAN 1 5 2014

**CAUSE NUMBER 13-07-07696-CV**

BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS

| | | |
|---|---|---|
| IN RE: THE COMMITMENT OF | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | MONTGOMERY COUNTY, TEXAS |
| | § | |
| GERARD NEIL MATZEN | § | 435TH  JUDICIAL  DISTRICT |

## FINAL JUDGMENT

BE IT REMEMBERED that on January 13, 2014, this cause came to trial and the parties announced "Ready". After considering the evidence, arguments and Court's charge, on January 15, 2014, the jury unanimously found beyond a reasonable doubt that GERARD NEIL MATZEN is a **sexually violent predator** as defined in Texas Health & Safety Code § 841.003. It is therefore:

**ORDERED, ADJUDGED and DECREED** that GERARD NEIL MATZEN is a **sexually violent predator** as defined in Texas Health & Safety Code § 841.003 and is civilly committed as such in accordance with Texas Health & Safety Code § 841.081 for outpatient treatment and supervision to be coordinated by a case manager whose directives GERARD NEIL MATZEN shall follow. Such outpatient treatment shall begin upon the person's release from a secure correctional facility and be conducted in accordance with this Final Judgment and that Order of Commitment signed this date. GERARD NEIL MATZEN shall continue in such commitment until the behavioral abnormality of GERARD NEIL MATZEN has changed to the extent that GERARD NEIL MATZEN is no longer likely to engage in a predatory act of sexual violence and is released from commitment in accordance with Texas Health & Safety Code §§ 841.103(c), 841.121, or 841.124.

All costs are charged to the State of Texas pursuant to Texas Health & Safety Code § 841.146(c). All relief not granted herein is **DENIED.**

SIGNED on January 15, 2014.

Judge P.K. Reiter
Sitting as
435th District Court
JUDGE PRESIDING

GERARD NEIL MATZEN, Respondent                    Respondent's Counsel

Page 1 of 3  FJ AND OC FOR SVP GERARD NEIL MATZEN

RECEIVED AND FILED
FOR RECORD
At 11:00 O'Clock A M

JAN 15 2014

BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS
By _____ Deputy

**CAUSE NUMBER 13-07-07696-CV**

| | | |
|---|---|---|
| IN RE: THE COMMITMENT OF | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | MONTGOMERY COUNTY, TEXAS |
| | § | |
| GERARD NEIL MATZEN | § | 435TH JUDICIAL DISTRICT |

## ORDER OF COMMITMENT

GERARD NEIL MATZEN has this day been adjudged a **sexually violent predator** as defined in Texas Health & Safety Code § 841.003 and has been **civilly committed** as such in accordance with Texas Health & Safety Code § 841.081. Therefore the following commitment requirements in accordance with § 841.082 are necessary to ensure that GERARD NEIL MATZEN complies with treatment and supervision and to protect the community. It is accordingly:

**ORDERED** that:

1. Upon release from any TDCJ-CID facility, GERARD NEIL MATZEN shall immediately be transported by an Office of Violent Sex Offender Management ("Office") representative or a TDCJ representative to the contracted Texas residential facility.

2. GERARD NEIL MATZEN shall reside in supervised housing at a Texas residential facility under contract with the "Office" or at another location or facility approved by the Office;

3. GERARD NEIL MATZEN shall not contact directly or indirectly, by any means, a victim, potential victim or complaining witness in cases in which he has been implicated or convicted;

4. GERARD NEIL MATZEN shall not possess or use alcohol, inhalants, or controlled substances not prescribed by a medical doctor for a legitimate medical purpose;

5. GERARD NEIL MATZEN shall exactingly participate in and comply with the specific course of treatment provided by the Office and shall comply with all written requirements of the Office and case manager;

6. GERARD NEIL MATZEN is required to submit to tracking under a global positioning satellite (GPS) monitor or other monitoring system provided; GERARD NEIL MATZEN shall not tamper with, alter, modify, obstruct or manipulate the GPS monitor frequency, and shall comply with all written monitor system requirements;

7. GERARD NEIL MATZEN is prohibited from a change of residence or from leaving the State of Texas without prior written authorization from this Court;

8. The Court has determined that it is appropriate to establish a child safety zone such that GERARD NEIL MATZEN shall not:

   a. participate in an activity that at any time provides athletic, civic or cultural affairs to persons 17 years of age or younger; or

   b. be within 1,000 feet of a perimeter where children gather, including a school, day-care facility, playground, youth center, swimming pool, or video arcade; and

9.   GERARD NEIL MATZEN shall provide appropriate blood and hair samples to allow inclusion in the DNA Data Bank maintained by the State of Texas. It is further:

ORDERED that a treatment plan for GERARD NEIL MATZEN shall be developed by the treatment provider with the approval of the Office. The case manager shall provide treatment and supervision to GERARD NEIL MATZEN and make timely report to this Court regarding the status and the biennial examination of GERARD NEIL MATZEN required by Texas Health & Safety Code § 841.101. It is further:

ORDERED that GERARD NEIL MATZEN is hereby given notice that:

1. GERARD NEIL MATZEN shall strictly comply with the commitment requirements of Texas Health & Safety Code § 841.082, the Final Judgment and this Order of Commitment, or will be charged with a felony of the third degree, which may be enhanced to a more severe punishment.
2. GERARD NEIL MATZEN shall strictly comply with sexual offender registration requirements Code of Criminal Procedure Chapter 62, or be charged with a felony of the second degree, which may be enhanced to a more severe punishment.
3. GERARD NEIL MATZEN has the right to file an unauthorized petition for release pursuant to Texas Health and Safety Code § 841.122.  It is further:

ORDERED that a biennial review shall be conducted, in accordance with Texas Health and Safety Code § 841.102, on or about January 15, 2016. If the Court determines at the biennial review that a requirement imposed should be modified, or that there is probable cause to believe that GERARD NEIL MATZEN is no longer likely to engage in a predatory act of sexual violence, notice will given and a hearing set upon written motion.

SIGNED on January 15, 2014.

Judge P.K. Reiter
Sitting as
435th District Court
JUDGE PRESIDING

Thumbprint of GERARD NEIL MATZEN
taken by

GERARD NEIL MATZEN

# BILL ANALYSIS

*Exhibit "B"*

**S.B. 746**
By: Whitmire
Criminal Jurisprudence
Committee Report (Unamended)

## BACKGROUND AND PURPOSE

Interested parties claim that problems with the current process under which sexually violent predators are civilly committed could result in a major threat to public safety in Texas. While the civil commitment process is designed to provide a safety net for certain high-risk repeat sex offenders, mismanagement of the Office of Violent Sex Offender Management has reportedly led to the total replacement of that office's management and the restructure of its governing board. Additionally, the parties contend that the court designated to conduct these civil commitment trials is currently in complete disarray. Because of these management issues, the parties explain, all major vendors who currently house these individuals have provided notice that they intend to cease providing housing services in the near future. S.B. 746 seeks to address these issues by revising provisions relating to the civil commitment of sexually violent predators.

## CRIMINAL JUSTICE IMPACT

It is the committee's opinion that this bill does not expressly create a criminal offense, increase the punishment for an existing criminal offense or category of offenses, or change the eligibility of a person for community supervision, parole, or mandatory supervision.

## RULEMAKING AUTHORITY

It is the committee's opinion that this bill does not expressly grant any additional rulemaking authority to a state officer, department, agency, or institution.

## ANALYSIS

S.B. 746 amends the Government Code to rename the Office of Violent Sex Offender Management as the Texas Civil Commitment Office. The bill increases from three to five the number of members of the office's governing board and requires the governor, as soon as practicable after the bill's effective date, to appoint the additional board members to terms specified by the bill. The bill repeals Health and Safety Code provisions establishing that the civil division of the special prosecution unit is responsible for initiating and pursuing a proceeding for the civil commitment of a sexually violent predator and requiring the Office of State Counsel for Offenders to represent an indigent person subject to a civil commitment proceeding as a sexually violent predator.

S.B. 746 amends the Health and Safety Code, including provisions amended by S.B. 219, Acts of the 84th Legislature, Regular Session, 2015, to remove being adjudged not guilty by reason of

insanity of a sexually violent offense as a condition under which a person may be considered a repeat sexually violent offender. The bill includes among the responsibilities of the Texas Civil Commitment Office developing and implementing a sex offender treatment program for persons civilly committed as sexually violent predators and specifies that the appropriate and necessary treatment and supervision that the office is responsible for providing through the case management system is treatment and supervision for such committed persons.

**S.B. 746** revises the composition of the multidisciplinary team established to review available records of a person referred to the team and make certain assessments regarding whether the person is likely to commit a future sexually violent offense and requires the Texas Department of Criminal Justice (TDCJ), in consultation with the office, to provide training to the team members regarding the civil commitment program. The bill repeals the requirement for the Department of State Health Services (DSHS) to give to the multidisciplinary team written notice of the anticipated discharge of a person who is committed to DSHS after having been adjudged not guilty by reason of insanity of certain sexually violent offenses and who may be a repeat sexually violent offender. The bill authorizes TDCJ, regardless of whether any exigent circumstances are present, to give written notice to the multidisciplinary team of the anticipated release of a sexually violent offender who is scheduled to be released on parole or to mandatory supervision only if the person's anticipated release date is not later than 24 months after the date on which the notice will be given. The bill prohibits TDCJ from giving notice with respect to a person who is currently released on parole or to mandatory supervision but authorizes the multidisciplinary team to perform its functions within the required period if the written notice was received by the team before the date of the person's release. The bill changes the deadline by which TDCJ is required to give notice to the multidisciplinary team from not later than the first day of the 16th month before the person's anticipated release date to not later than the first day of the 24th month before such date. The bill prohibits TDCJ from providing the notice of the anticipated release of a person for whom TDCJ has previously provided notice and who has been previously recommended for an assessment unless, after the recommendation was made, the person is convicted of a new sexually violent offense, or the person's parole or mandatory supervision is revoked based on the commission of a new sexually violent offense, failure to adhere to the requirements of sex offender treatment and supervision, or failure to register as a sex offender.

**S.B. 746** specifies that the attorney to which TDCJ is required to give notice of an assessment that a person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence and provide corresponding documentation is the attorney representing the state for the county in which the person was most recently convicted of a sexually violent offense. The bill redefines "attorney representing the state," for purposes of the civil commitment of sexually violent predators, as a district attorney, criminal district attorney, or county attorney with felony criminal jurisdiction who represents the state in a civil commitment proceeding. The bill changes the court in which the attorney representing the state is authorized to file a petition alleging that the person referred is a sexually violent predator and stating facts sufficient to support the allegation from a Montgomery County district court other than a family district court to the court of conviction for the person's most recent sexually violent offense.

**S.B. 746** requires an agreed order of civil commitment to require the person to submit to the treatment and supervision administered by the office. The bill removes the specification that the treatment provided to a person civilly committed as a sexually violent predator is outpatient treatment and changes the entity responsible for coordinating the treatment and supervision of such a person from a case manager to the office. The bill transfers certain powers and duties relating to

civilly committed persons from the case manager to the office. The bill revises the requirements to be imposed on a person who is civilly committed as a sexually violent predator and removes the following requirements that must be imposed: a requirement prohibiting the person's contact with a potential victim, a requirement prohibiting the person's possession or use of alcohol, inhalants, or a controlled substance, a requirement relating to the establishment of a child safety zone, if determined appropriate by the judge, and any other requirements determined necessary by the judge.

*S.B. 746* requires TDCJ to prioritize enrolling in a sex offender treatment program established by TDCJ any committed person who has not yet been released by TDCJ. The bill requires TDCJ and the office to adopt a memorandum of understanding that establishes their respective responsibilities to institute a continuity of care for committed persons enrolled in a sex offender treatment program established by TDCJ.

*S.B. 746* removes the requirement of the office to approve and contract for the provision of a treatment plan for the committed person to be developed by the treatment provider and instead requires the office to determine the conditions of supervision and treatment of a committed person. The bill removes an authorization for the treatment provider to receive annual compensation in an amount not to exceed $10,000 for providing the required treatment. The bill changes the entity with which the office is required to enter into appropriate memoranda of understanding for the provision of a tracking service from the Department of Public Safety to TDCJ. The bill removes the requirement that the office enter into appropriate memoranda of understanding for any supervised necessary housing and instead requires the office to enter into appropriate contracts for the provision of any necessary supervised housing and other related services and authorizes the office to enter into appropriate contracts for medical and mental health services and sex offender treatment. The bill removes the requirement that the office reimburse the applicable provider for housing costs. The bill removes the requirement that the case manager make timely recommendations to the judge on whether to allow the committed person to change residence or to leave the state and on any other appropriate matters and removes the requirement that a case manager's report to the office include any recommendations made to the judge.

*S.B. 746* requires the office to develop a tiered program for the supervision and treatment of a committed person that provides for the seamless transition of a committed person from a total confinement facility to less restrictive housing and supervision and eventually to release from civil commitment, based on the person's behavior and progress in treatment. The bill requires the office to operate, or contract with a vendor to operate, one or more facilities provided for the purpose of housing committed persons and to designate an intake and orientation facility for committed persons on release from a secure correctional facility. The bill requires the office to develop procedures for the security and monitoring of committed persons in each programming tier and to transfer a committed person to less restrictive housing and supervision if the transfer is in the best interests of the person and conditions can be imposed that adequately protect the community.

*S.B. 746* authorizes a committed person, without the office's approval, to file a petition with the court for transfer to less restrictive housing and supervision. The bill requires the court to grant the transfer if the court determines that the transfer is in the best interests of the person and conditions can be imposed that adequately protect the community. The bill requires the office to return a committed person who has been transferred to less restrictive housing and supervision to a more restrictive setting if the office considers the transfer necessary to further treatment and to protect the community and requires the transfer decision to be based on the person's behavior or progress

in treatment. The bill entitles a committed person returned to a more restrictive setting to file a petition with the court seeking review of the office's determination and requires the court to order the office to transfer the person to less restrictive housing and supervision only if the court determines that the office's determination was not based on the person's behavior or progress in treatment.

**S.B. 746** requires the Health and Human Services Commission (HHSC) to coordinate with the office to provide psychiatric services, disability services, and housing for a committed person with an intellectual or developmental disability, a mental illness, or a physical disability that prevents the person from effectively participating in the sex offender treatment program administered by the office. The bill requires a committed person released from housing operated by or under contract with the office to be released to the county in which the person was most recently convicted of a sexually violent offense.

**S.B. 746** includes the cost of housing and treatment among the costs for which a civilly committed person who is not indigent is responsible and required to pay to the office on a monthly basis. The bill removes the specification that the monthly payments are for service to be provided during the subsequent month. The bill removes the requirement that the office immediately transfer the money to the appropriate provider and instead requires money collected from the committed person for payment of costs to be deposited to the credit of the account from which the costs were originally paid. The bill excludes the civil commitment requirement requiring the person's participation in and compliance with the sex offender treatment program provided by the office and compliance with all written requirements imposed by the office from the civil commitment requirements the violation of which constitutes an offense.

**S.B. 746** changes from the case manager to the office the entity that is required to provide a report of the biennial examination of a civilly committed sexually violent predator to the judge in preparation for a biennial review of the committed person's status and also requires the office to provide the report to the person who is the subject of the report. The bill specifies that the judge is required to conduct the biennial review not later than the 60th day after the date of receipt of the report and requires the judge to issue an order concluding the review or setting a hearing by that same deadline.

**S.B. 746** removes the requirement that a judge attempt to review a petition for release filed by a committed person without the appropriate authorization as soon as practicable on receipt of the petition and instead requires the judge to review and issue a ruling on such a petition not later than the 60th day after the date of filing of the petition. The bill changes the time by which the judge is required to conduct a hearing on such a petition if the judge does not deny the petition from as soon as practicable to not later than the 60th day after the date of filing of the petition.

**S.B. 746** expands the office's rulemaking authority to include the requirement to adopt rules to determine the conditions of supervision and treatment of a committed person and rules to develop and implement the tiered program. The bill clarifies that a court is required to appoint counsel to represent a person subject to a civil commitment proceeding if the person is indigent. The bill includes the applicable attorney representing the state and an employee of the attorney among the individuals who are immune from liability for good faith conduct under statutory provisions relating to civil commitment of sexually violent predators.

**S.B. 746** clarifies that the duties imposed on the office and the judge by statutory provisions

relating to civil commitment of sexually violent predators are suspended for the duration of a detention or confinement of a committed person in a correctional facility, secure correctional facility, or secure detention facility, or if applicable any other commitment of the person to a community center, mental health facility, or state supported living center, by governmental action. The bill requires a correctional facility, secure correctional facility, or secure detention facility to notify the office in writing of the anticipated date and time of release of a person who, at the time of the person's detention or confinement, was civilly committed as a sexually violent predator.

*S.B. 746* amends the Code of Criminal Procedure to authorize an offense involving the violation of a civil commitment requirement imposed on a sexually violent predator to be prosecuted in the court that retains jurisdiction over the civil commitment proceeding, as an alternative to being prosecuted in the county in which any element of the offense occurs, and removes the specification that the offense may be prosecuted in Montgomery County.

*S.B. 746* repeals Government Code provisions requiring the 435th District Court to give preference to proceedings regarding the civil commitment of sexually violent predators, criminal cases involving certain offenses relating to civil commitment requirements, and other matters that may be assigned by the administrative judge. The bill amends the Government Code to make the requirement that the state pay salaries of and other expenses related to the court reporter and court coordinator appointed for the 435th District Court applicable only to the extent that the duties of those individuals relate to proceedings for the civil commitment of a sexually violent predator or to criminal cases involving the violation of certain civil commitment requirements imposed on such a person.

*S.B. 746* requires the applicable court with jurisdiction over a person civilly committed as a sexually violent predator, if a civil commitment requirement imposed before the bill's effective date differs from any of the civil commitment requirements amended by the bill, to modify the requirement imposed as applicable to conform to that section after notice and hearing. The bill's changes to the offense involving the violation of a civil commitment requirement apply to an offense committed before, on, or after the bill's effective date, but the bill establishes that a final conviction for such an offense that exists on the bill's effective date remains unaffected by the bill's provisions.

*S.B. 746* repeals the following provisions:

- Section 24.579(b), Government Code
- Sections 841.004, 841.005, 841.021(b), and 841.085(c), Health and Safety Code

## EFFECTIVE DATE

September 1, 2015.

Exhibit "C"

## Civil Commitment Center for Violent Sex Offenders
### Responses to Vendors' Questions

| Vendor Question | Response |
|---|---|
| 1. Please provide the time the proposal is due on July 17, 2015. Page 50 - Section 3.13.2 | 1. 2:00 PM (CT) |
| 2. Section 2.4.16 Laundry Facilities, Letter D. states that "Contractor shall provide OVSOM with description of any additional food services provided…" Please clarify this requirement for Laundry Facilities. Page 27 - Section 2.4.16(D) | 2. Item (D) in Section 2.4.16 has been removed. |
| 3. Section 2.4.19 Telecommunications, Letter B. states that "Contractor shall provide OVSOM with description of any additional food services provided…" Please clarify this requirement for Telecommunications. Page 28 - Section 2.4.19(B) | 3. Item (B) in Section 2.4.19 has been removed |
| 4. Please confirm that Bidders proposing more than one center/location need to only provide a separate complete set of A. Section 6.3, Pricing Schedule and B. Appendix F, Program Budget and Staff Plan, Justification Forms for each proposed center/location with our proposal response. Page 57 - Part III Cost Proposal, Section 1 | 4. A Pricing Schedule and Appendix F shall be provided for each proposed site. |
| 5. Please provide copies of all "applicable OVSOM Policies." Page 12 - Section 2.3 | 5. As a result of SB 746, all current OVSOM policies are under review. |
| 6. Please confirm that SVP clients may participate in therapeutic work program assignments. Page 14 - Section 2.4.2(B) | 6. Clients may participate in therapeutic work program assignments with OVSOM management prior approval. |
| 7. Please confirm that PDF format is allowed for proposal requirements such as signature pages, printouts for required forms, graphics-intensive documents such as technical response, etc. Page 50 - Section 3.13.1 | 7. Confirmed. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| 8. Section 2.4.4.C (pg.17) states that the facility will provide "tiered housing ranging from total confinement to a less restrictive environment." Section 2.4.10.C (pg. 23) states, "SVP Clients shall have access to health care in the community. OVSOM shall not be responsible for health care costs." Does OVSOM envision that SVPs in the "total confinement" tier will be leaving the facility to receive healthcare?   Page 17 - Section 2.4.4(C), Page 23 - Section 2.4.10(C) | 8. OVSOM envisions that the contractor shall provide routine on-site primary care. Specialty, major emergency care, and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |
| 9. It is our understanding that currently all SVP residents have GPS monitoring. Under the envisioned tiered program, which tiers will be subject to GPS monitoring?   Page 17 - Section 2.4.4(C) | 9. Clients in all tiers are subject to GPS monitoring. |
| 10. What is the anticipated census at any given time requiring the total confinement option? General | 10. Currently, the OVSOM has 95 clients in level one, which would be considered total confinement. |
| 11. What is the anticipated length of stay in the total confinement option? General | 11. The program is client driven, thus the length of stay in any tier is based on the client's overall participation, progress, and compliance with program requirements. |
| 12. Will the Contractor have input regarding decisions to transfer to a less restrictive alternative or authorization to petition for release? If so, please describe the mechanism that OVSOM envisions.   Page 21 - Section 2.4.8(D) | 12. A treatment team, which includes one employee from contractor staff, will make a recommendation to OVSOM management. OVSOM management will make the final determination. |
| 13. Please provide specific demographics of the 200 Sexually Violent Predators including age groups, gender, medical and psychiatric diagnoses and number deemed indigent.   Page 7 - Section 1.5.2 | 13. Average age of all SVPS: 52.52 Years  Average age of SVPs in Community: 53.32 Years  Average age of SVPs in Prison: 51.65 Years  Ethnicity of all SVPS: 24.93% African American, 54.47% Caucasian, 20.33% Hispanic, 0.27% Native American/Alaskan Native  Ethnicity of SVPs in the Community: 22.40% |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | African American, 53.13% Caucasian, 23,96% Hispanic, 0.52% Native American/Alaskan Native |
| | Ethnicity of SVPs in Prison: 27.68% African American, 55.93% Caucasian, 16.38% Hispanic |
| | 25% of the 193 clients currently living in the community receive mental health services. Note, however, that SB 746 requires the Health and Human Services Commission to coordinate with OVSOM to provide psychiatric services, disability services, and housing for a committed person with an intellectual or developmental disability, a mental illness, or a physical disability that prevents the person from effectively participating in the sex offender treatment program administered by OVSOM. |
| | Approximately 125 SVP clients in the community are deemed indigent. |
| 14. For the upcoming biennial, what is the OVSOM budget currently allocated to residential services? To treatment services? To case management? To GPS and/or electronic monitoring? To central office? Page 9 - Section 1.7 | 14. Please refer to HB 1 |
| 15. Define serious and/or unusual incidents and the specific time frame to comply with "immediate" reporting. What is the current rate of occurrence of these types of events? Page 17 - Section 2.4.3(G) | 15. Incidents or issues requiring immediate notification to the OVSOM include but are not limited to: serious injury/illness, death, absconders, threats made by an OVSOM client, the client is at risk of doing harm to himself or others, inappropriate behaviors toward staff, the OVSOM client commits a violation that has criminal intent, or natural disaster. Immediate notification is defined as reporting the incident to the OVSOM immediately upon becoming aware of the incident. OVSOM does not currently have the rate of occurrences. |
| 16. How many Clients are currently using GPS or other forms of electronic monitoring? Who is responsible for these costs and monitoring? Page 18 - Section 2.4.4(J) | 16. All OVSOM clients in the community are on a GPS monitoring system as a requirement of their Civil Commitment. The OVSOM is responsible for the cost and monitoring of the GPS |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | equipment. In some instances, the SVP client pays for all or a percentage of the cost of his equipment. |
| 17. Is it OVSOM's intent to have one separately keyed and secure office for case managers? How many OVSOM case managers are currently employed and where are they located? Please provide job description. Page 18 - Section 2.4.4(N) | 17. Yes, it is the OVSOM intent to have separately keyed offices for the case managers.

The number of case managers shall be based on the total number of beds proposed.

The case manager job description is included. |
| 18. What is the number of clients currently participating in each of the listed programs? Is program participation a requirement? What is the average number of hours per week that a client receives sex offender specific programming? Is sex offender specific programming currently provided on or off-site? Page 20 - Section 2.4.8(A) | 18. The listed programs are not currently provided.

Yes, program participation is required.

OVSOM clients currently participate in 3 hours of group counseling per week and 2 individual sessions per month.

Sex offender treatment is currently provided on- and off-site, dependent upon the Licensed Sex Offender Treatment Provider, the city of operation and the facility where the client resides. |
| 19. How many Clients have been successfully released from the program? What criteria are used and who is the ultimate decision maker of release from the facility? Page 21 - Section 2.4.8 (D) | 19. The court has not released any OVSOM clients from the civil commitment program.

The criteria used for successful release requires the client to be in the aftercare phase of treatment and he must petition the court for release. The Judge/Court is the ultimate decision maker for release from the order of civil commitment. |
| 20. SVP Clients shall have access to health care in the community. Would routine on-site primary care with referral to the community for specialty care be considered compliant? Who is responsible for health care costs of clients? Page 23 - Section 2.4.10(C) | 20. OVSOM envisions that the contractor shall provide routine on-site primary care. Specialty, major emergency care, and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |
| 21. Provide the number of clients currently working, going to school, receiving treatment in the community or receive approved passes. Page 24 - Section 2.4.12(A) | 21. Eight OVSOM clients are currently working, zero are currently in school, zero have been approved for overnight passes over the past 12 months.

Currently 25% of OVSOM clients in the community receive mental health services. Note, however, that SB 746 requires the Health and |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | Human Services Commission to coordinate with OVSOM to provide psychiatric services, disability services, and housing for a committed person with an intellectual or developmental disability, a mental illness, or a physical disability that prevents the person from effectively participating in the sex offender treatment program administered by OVSOM. |
| 22. Of the modes of transportation mentioned, how does the case manager determine which option to use? If Contractor facility transport is chosen, how will the Contractor be reimbursed for trips within the county? When using any transportation in the community are any security devices used? Page 28 - Section 2.4.18(A) | 22. Various issues go into determining the mode of transport. The distance, the level of the client, the location to which the client is traveling.   The method of reimbursement to the Contractor is to be proposed in the RFP.<br><br>No security devices are currently used when transporting clients in the community.   The contractor shall propose what if any security devices shall be used during transportation in the community, keeping in mind that these clients are not in custody or incarcerated.   Any security devices proposed shall be in accordance with transport guidelines or standards for mental health populations. |
| 23. "No physical contact by staff shall be made on a SVP Client" appears to conflict with Page 32, 2.4.28 (C) Use of Force. Please clarify. What specific restraining devices and security equipment will be authorized in emergency situations? Page 30 - Section 2.4.25(A)(1) | 23. No   conflict   exists   between   the   sections referenced; use of force in section 2.4.28(C) is an exception.   Additionally, please note that the contractor shall propose what (if any) security devices will be used during transportation in the community, keeping in mind that these clients are not in custody and are not incarcerated.   Any security devices proposed shall be in accordance with transport guidelines or standards for mental health populations. |
| 24. If the Contractor cannot bill for any day the Client is in the hospital, does this mean that the Contractor has no responsibility for providing supervision while the Client is hospitalized? If so, who provides supervision? Who is responsible for Client healthcare and hospitalization costs?    Page 38 - Section 2.13(E) | 24. The contractor may bill for any day the client is in the hospital.   Supervision by contractor during client hospitalization shall be determined based on the client's level/tier.<br><br>In instances where the contractor does not provide supervision, OVSOM case managers may conduct surveillance.<br><br>OVSOM envisions that the contractor shall provide routine on-site primary care.   Specialty, |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | major emergency care, and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |
| 25. Please provide a breakdown of the current census by location. General | 25. Austin 28, Dallas 20, Ft. Worth 31, Houston 76 El Paso ) |
| 26. Do the incumbent providers of these services provide any sex offender specific programming? If so, how many hours per week? If not, who provides sex offender specific programming? Page 20 - Section 2.4.8(A) | 26. OVSOM clients currently participate in 3 hours of group counseling per week and 2 individual sessions per month provided by licensed sex offender treatment providers under contract with OVSOM. |
| 27. Please confirm that incumbent providers will be required to submit community notification forms. Page 51 - Section 3.14.2 | 27. If the same contractor is currently in the facility that will be proposed under this RFP and has previously provided community notification, then the incumbent contractor is not required to provide additional notification. The contractor should provide a summary advising of date of last notification with a list of officials that were notified. |
| 28. How many residents were approved to seek employment in the past year? General | 28. The number of residents allowed to seek employment varies at any given time as it is based on their supervision level and approval of the case management team. |
| 29. How many staff, if any, typically accompany SVPs while outside the facility? Are these OVSOM employees or contractors? If contractors, what are the annual costs associated with these contracts? Page 28 - Section 2.4.18 | 29. There is no specific number of staff required to accompany an SVP client while in the community. OVSOM staff does not routinely accompany the SVP client, but will provide surveillance when the SVP client is in the community. |
| 30. The RFP states that "state certification and licensing requirements shall apply to all health care personnel, employed by the Contractor, responsible for dispensing medical services..." Please define "dispensing medical services." Page 23 - Section 2.4.10(D) | 30. Section 2.4.10(D) has been revised to read: "State certification and licensing requirements shall apply to all health care personnel employed by the Contractor, responsible for **providing** medical services to SVP Clients." |
| 31. At the vendor conference, it was stated that community notification letters must be delivered at least 30 days prior to the due | 31. Confirmed. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| date. Please confirm. General | |
| 32. At the vendor conference, it was stated that of the 369 total SVP clients that 193 were in the community. Please confirm that the 193 in the community will be placed at the multi-tiered Civil Commitment Center and that the remaining 176 individuals are currently in correctional facilities. If so, how many of the remaining 176 SVP clients will be transferred to the Civil Commitment Center upon discharge from a correctional facility? General | 32. Currently, there is a potential for placement of up to 193 SVP clients at the Civil Commitment Center. The remaining 176 SVP clients currently in correctional facilities will be transferred to the Civil Commitment Center upon release from a correctional facility. |
| 33. At the vendor conference, it was stated that 95 SVP clients are in Tier 1. Please clarify whether these 95 SVP clients are currently living in the community. General | 33. These 95 SVP clients are currently living in the community. |
| 34. At the vendor conference, it was stated that SVP clients and correctional populations may be co-located but that total separation between these populations must be maintained. Please confirm. General | 34. Confirmed. |
| 35. At the vendor conference, it was stated that the community notifications could be hand delivered or mailed via Fed Ex or UPS in addition to obtaining a signature receipt upon delivery to ensure the 30 day deadline is met. Please confirm. General | 35. Section 3.14.2 has been revised and the revision has been posted on the Electronic State Business Daily. |
| 36. At the vendor conference, it was stated that in the event Bidders did not receive the response forms after notifying elected officials, that certified mail receipt would be sufficient. Please confirm. General | 36. Confirmed. |
| 37. At the bid conference, it was stated that OVSOM would not be responsible for healthcare costs. However, it is anticipated that many clients will be indigent and not have healthcare benefits. Given that most community healthcare providers will not provide care for non-emergent healthcare conditions for indigent patients, will payment for this healthcare be the responsibility of the | 37. OVSOM envisions that the contractor shall provide routine on-site primary care. Specialty, major emergency care, and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |

## Civil Commitment Center for Violent Sex Offenders
### Responses to Vendors' Questions

| | |
|---|---|
| vendor? General | |
| 38. Since the change in current statute allows for "total confinement" of SVP clients, please clarify whether this requires potential vendors to provide healthcare to SVP clients housed in a secure setting in order to maintain a constitutional level of care. If so, who is responsible for the cost of these services? General | 38. OVSOM envisions that the contractor shall provide routine on-site primary care. Specialty, major emergency care, and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |
| 39. According to the recent Pew and MacArthur Foundation Report (July, 2014), health care costs increase significantly for inmates above the age of 50 years. According to the recent Biennial Report regarding the Office of Violent Sex Offender Management, 59% of OVSOM program participants are above the age of 50. What are the per inmate health care costs associated with the over 50 population? Page 22 - Section 2.4.10 | 39. OVSOM does not pay for health care costs; therefore, OVSOM has no health care cost information to provide. |
| 40. Appendix B – Revenue Identification Form provides vendors with line items to report telephone revenue and vending revenue. Please confirm that revenue is referring to profit. Page 77 - Appendix B | 40. Confirmed. |
| 41. If available, please provide an excel spreadsheet for Appendix F – Program Budget and Staff Plan. Page 84 - Appendix F | 41. Provided with this response.<br><br>Excel_Appendix F.xls |
| 42. Will the questions be published? | 42. Yes. |
| 43. May this population be co-located with a correctional population? If so, what are the requirements regarding separation of populations? | 43. Yes and no. They may be co-located in a facility but they cannot come together, or commingle. They would need to be separated. They cannot come together and all services must be provided separately. |
| 44. What is the total current population that will be assigned to the civil commitment center in all tiers? | 44. OVSOM's expectation is that up to 193 clients will be admitted to the civil commitment center on 9/1/2015, with all tiered levels fully activated within 60 – 90 days from 9/1/2015. |
| 45. What is the percentage of SVP's likely to be | 45. It depends on the assessment conducted on each |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| released to the community? Of those, how does that relate to location of Civil Commitment Center? If the Civil Commitment Center is in Harris County, will Harris County receive any or all of these releases? | client. Under the new law, clients that are released from a facility must be placed in their last county of conviction. They cannot be released to the county where the facility is. |
| 46. How much time will be given to ramp up to maximum population/capacity? | 46. OVSOM's expectation is that up to 193 clients will be admitted 9/1/2015, with all tiered levels fully activated within 60 – 90 days from 9/1/2015. |
| 47. What percentage can be subcontracted? | 47. The percentage of the contract that can be subcontracted is solely up to the Respondent. |
| 48. Section 2.4.10(C) - What is meant by "OVSOM shall not be responsible for health care costs?" | 48. OVSOM envisions that the contractor shall provide routine on-site primary care. Specialty, major emergency care and hospitalization shall be provided in the community. OVSOM clients are responsible for the cost of their health care and medication costs. |
| 49. What if you notify the community but don't have the land/property tied up and may move to a new address within that same jurisdiction? What if you have two or more possible sites? Should you notify on all possible sites even if they are in the same jurisdiction? | 49. Notice should be specific to each location. If you have two or more possible sites and the sites fall within the same jurisdiction, include all possible sites in the same notification. Yes, notification should be provided on all possible sites, even when they are in the same jurisdiction. |
| 50. Does the 30 day notification requirement come from the RFP or the statute? | 50. Both. They are meant to be in alignment with each other. The deadline for proposals is July 17. There is just enough time to then award a contract on July 24, 2015. |
| 51. Is it adequate if you postmarked your notification on Tuesday? | 51. Section 3.14.2 has been revised and the revision has been posted on the Electronic State Business Daily. |
| 52. How quickly and in what priority does OVSOM anticipate the beds will be filled? Will all 193 clients be admitted as of 9/1? What is the expected timeframe for tiered levels of privilege to be activated? General Paragraph 1.5.2 | 52. OVSOM's expectation is that up to 193 clients will be admitted 9/1/2015<br><br>OVSOM's expectation is that tiered levels will be fully activated within 60 – 90 days from 9/1/2015 |

## Civil Commitment Center for Violent Sex Offenders
### Responses to Vendors' Questions

| | |
|---|---|
| 53. Will all clients be monitored via GPS and if so, by the contractor? Will the contractor be expected to provide urine/drug screens? Pg. 7 - General Paragraph 1.6.1 | 53. All OVSOM clients are subject to GPS monitoring. GPS monitoring services are not requested under this solicitation.<br><br>It is OVSOM's expectation that contractor shall provide drug testing. |
| 54. Will the facility need to comply with the Texas Jail Standards? If not, are there DSHS standards that will need to be met? Will it be expected that this facility be licensed? Pg. 12 – Section 2.3 | 54. The facility does not need to comply with the Texas Jail Standards. There is no facility licensure requirement at this time. |
| 55. "The contractor shall not deviate…from applicable OVSOM policies." Can OVSOM provide a copy of these policies? Pg. 12 - Section 2.3 Compliance with Applicable Rules, Regulations, Policies, Procedures, and Laws | 55. As a result of SB 746, all current OVSOM policies are under review. |
| 56. What is the budgeted amount for this residential program? Are additional funds available for programing? If so, in what amount? General | 56. Please refer to HB 1. |
| 57. How long does OVSOM expect a client to be a resident of the facility? What responsibility might the contractor have to assist the client with community living arrangements? General | 57. The program is client driven, thus the length of stay in any tier is based on the client's overall participation, progress, and compliance with program requirements. .<br><br>OVSOM case managers will provide case management services, which includes assisting clients with possible community living arrangements. |
| 58. Please provide any historical or anticipated data on the number of transports required to be provided by program staff on a monthly basis by destinations types (court, medical, employment, etc.). Please provide information on the expectations of the contractor in providing transports? Are client transports expected to be in a secure vehicle? With one | 58. OVSOM does not maintain client transport data or have projections regarding transportation costs.<br><br>It is OVSOM's expectation that the contractor shall provide client transportation.<br><br>The contractor shall propose a client transport plan, to include what (if any) security devices shall be used during transportation in the |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| or two staff members?  General | community, keeping in mind that these clients are not in custody and are not incarcerated.  OVSOM shall approve contractor's client transportation plan.  Any security devises proposed shall be in accordance with transport guidelines or standards for mental health populations. |
| 59. Please provide a copy of the Model Workplace Guidelines developed by DSHS? Pg. 22 - Section 2.4.10 | 59. A link is provided in Section 2.4.10 to access DSHS Model Workplace Guidelines. |
| 60. "OVSOM shall not be responsible for health care costs." Please provide as much detail as possible of the current healthcare costs provided to clients in the community. Please provide information on the type and numbers of medical issues experienced by this client group. What level of medical care is the facility expected to provide? Is it expected that a nurse be on duty at all times? That the facility will operate an infirmary?  Pg. 23 - Section 2.4.10 Health Services | 60. OVSOM envisions that the contractor shall provide routine on-site primary care.  Specialty, major emergency care, and hospitalization shall be provided in the community.  OVSOM clients are responsible for the cost of their health care and medication costs. |
| 61. Are Contractors expected to include costs associated with GPS monitoring, drug testing, polygraphs, or other testing in their submissions? General | 61. GPS monitoring services are not requested under this solicitation.<br><br>It is OVSOM's expectation that contractor shall provide drug testing.<br><br>Contractor may propose polygraph exams, or other testing for OVSOM's consideration. |
| 62. How does the Department plan to manage any constitutional challenges by clients who may have been placed in the community and are now required to live in a secure facility? General | 62. OVSOM will provide clients with procedural safeguards to protect their right to due process OVSOM is represented by the Office of the Attorney General in all litigation. |
| 63. Please provide information regarding any violent episodes that have occurred by clients in the program and the outcomes/consequences of those actions. General | 63. The OVSOM only has statistics for the past year. Over the past year, there were 3 minor incidents. These were addressed through sanctions at the local level. |
| 64. What is the percentage of clients considered indigent by OVSOM? Pg. 27 - Section 2.4.15 SVP Clothing and Necessities | 64. Approximately 125 SVP clients of the 193 currently in the community are deemed indigent. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

|  |  |
|---|---|
| 65. If a client requires inpatient hospitalization, is it expected that a facility staff person remain with that client during the hospital stay? General | 65. The contractor shall propose a client transportation plan, to include what (if any) security devices shall be used during transportation in the community and circumstances under which facility staff should remain on location. In developing the transportation plan, the contractor shall consider that OVSOM clients are not in custody. OVSOM shall approve contractor's client transportation plan. Any security devices proposed shall be in accordance with transport guidelines or standards for mental health populations. |
| 66. Will the Department require Offerors to include the following policies, procedures, and manuals (which are to be "provided") as part of the proposal, or to be provided after contract award? Pgs. 13, 22, 25, 33 - Section 2.4 Specific Duties and Obligations, Section 2.4.1 – Training, Section 2.4.1.B, Section 2.4.10.A.4, Section 2.4.12.B, Section 2.6. D. | 66. 2.4.1.B. (13) Contractor shall provide… a copy of its training curriculum in its Operational Plan for the OVSOM approval.<br><br>▪ Provide with proposal.<br><br>2.4.10.A.4. (22) The Contractor shall provide the OVSOM with copies of the above stated policies/programs. (AIDS and HIV medical information for employees and SVP Clients)<br><br>▪ Provide with proposal.<br><br>2.4.12.B. (25) Contractor shall provide written policies on how its staff will monitor the CCTV Cameras and maintain the recordings of the CCTV cameras.<br><br>▪ Provide with proposal.<br><br>2.6. D. (33-34) The Contractor shall provide an Operational Plan that covers the full range of center operations.<br><br>▪ Provide with proposal. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | 1. A policy and procedures operations manual;<br><br>    ▪ Provide with proposal.<br><br>2. An emergency procedures/security manual for confidential use by the staff supervisors that are employed by the Contractor;<br><br>    ▪ Provide with proposal.<br><br>3. A fully developed training package to be administered to all the Contractor staff as described in 2.4.1;<br><br>    ▪ Provide with proposal.<br><br>4. Job descriptions for each position, education and experience requirements, descriptions of job duties, full-time or part-time designation, etc.; and<br><br>    ▪ Provide with proposal.<br><br>5. Program Budget and Staffing Plan Appendix F.<br><br>    ▪ Provide with proposal. |
| 67. Please provide the number of OVSOM Case Managers anticipated to be assigned to the center and a current job description for this position. Pg. 18 – Section 2.4.4.- Center Requirements Paragraph N | 67. The number of case managers shall be based on the total number of beds proposed.<br><br>Case manager job description is provided with this response.<br><br>PSII.pdf |
| 68. In the Admission Process of the solicitation, it states that "SVP client shall be entered into the Contractor's automated system". Does the Department have specific expectations regarding automated/electronic record keeping, etc.? If so, please provide. Pg. 19 – Section 2.4.7 - Program Description | 68. At minimum, contractor's automated system shall maintain real time tracking and accountability of all clients assigned to the facility. An automated system is typically used for submission of monthly billing. A windows based system capable of running a full desktop version of MS Office would be compatible with OVSOM's system. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| 69. Please provide data regarding the number of non-English speaking SVP Clients in the current population for whom language interpreter services will be needed. Pg. 20 – Section 2.4.7.-Program Description Paragraph .B.2.b | 69. The OVSOM does not have this data. |
| 70. Please provide available statistics on current SVP population, including demographics, diagnoses, risk assessment score data, PCL-R scores, etc. Pg. 21 – Section 2.4.8 SVP | 70. Client Participation in Programs<br><br>• Average age of all SVPS: 52.52 Years<br><br>• Average age of SVPs in Community: 53.32 Years<br><br>• Average age of SVPs in Prison: 51.65 Years<br><br>• Ethnicity of all SVPS: 24.93% African American, 54.47% Caucasian, 20.33% Hispanic, 0.27% Native American/Alaskan Native<br><br>• Ethnicity of SVPs in the Community: 22.40% African American, 53.13% Caucasian, 23,96% Hispanic, 0.52% Native American/Alaskan Native<br><br>• Ethnicity of SVPs in Prison: 27.68% African American, 55.93% Caucasian, 16.38% Hispanic<br><br>• 25% of the 193 clients currently living in the community receive mental health services. Note, however, that SB 746 requires the Health and Human Services Commission to coordinate with OVSOM to provide psychiatric services, disability services, and housing for a committed person with an intellectual or developmental disability, a mental illness, or a physical disability that prevents the person from effectively participating in the sex offender |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| | treatment program administered by OVSOM. |
| | • Approximately 125 SVP clients in the community are deemed indigent |
| 71. Please describe the current level of sex offender treatment services that SVP clients are currently receiving in the community (i.e., #hours per week, group vs. individual, etc.). Pg. 21 - 2.4.8 SVP Client Participation in Programs | 71. OVSOM clients currently participate in 3 hours of group counseling per week and 2 individual sessions per month. |
| 72. Does the Department expect the OVSOM Case Manager(s) to be located on-site? Pg. 21 - Section 2.4.8 SVP Client Participation in Programs Paragraph D | 72. Yes.   It is OVSOM's expectation that the contractor shall provide separately keyed offices for the case managers. |
| 73. Paragraph C. states that, "All records shall be locked in a file cabinet accessible only to the Contractor's staff and/or the OVSOM representatives." Will a locked room with restricted access fulfill this requirement? Pg. 21 – Section 2.4.9 SVP Client Records | 73. No.   Section 2.4.9(C) SVP Client Records has been revised to read, "All records shall be locked in a file cabinet located in an area accessible only to the Contractor's staff and/or the OVSOM representatives." |
| 74. Use of Force – Please list all applicable legislation, administrative rules, or codes governing use of force that apply to the SVP Client population (e.g.,. restraint and seclusion, secure transport, etc.).  Pg. 28 – Section 2.4.28 SVP Civil Rights Paragraph C Use of Force | 74. There are no TAC regulations or codes concerning the use of force for a civilly committed sex offender.

The contractor shall propose a Use of Force plan, to include what (if any) restraint devices shall be used and the circumstances under which facility staff may use said restraints.  In developing the Use of Force plan, the contractor shall consider that OVSOM clients are not in custody.  OVSOM shall approve contractor's Use of Force plan.  Use of any security devices shall be the minimum needed to gain compliance and shall be limited in use to a means of last resort. |
| 75. The RFP states that "In addition, submit one electronic copy of the proposal on a portable media device, preferably flash drive, and compatible with Microsoft Office 2010. PDF format is not allowed, except for signature pages." Many of the documents requested by the OVSOM, (i.e., Annual Financial | 75. Yes we will accept PDF. |

## Civil Commitment Center for Violent Sex Offenders
### Responses to Vendors' Questions

| | |
|---|---|
| Statements, Certificate of Existence from the Texas Secretary of State and the Certificate of Good Standing from the Texas Comptroller of Public Accounts (see Business Proposal, Subsection 1, Paragraphs D-E), are in a PDF format only. Converting these files into a compatible Microsoft Office format might compromise the integrity of these documents. Would the Department consider relaxing this requirement? Pg. 49-50 - Section 3 General Instructions and Proposal Requirement Subsection 3.13.1 Number of Copies | |
| 76. In this schedule are we to provide Daily Per Diem for the base Period? Commencement to 8/31/19 and likewise for the 2 year Option Period One and Two? Is the rate sought a blended rate (i.e. a single rate covering all five years in the Base Period and/or two Option Periods) or separate rates for each year? Pg. 70 – Section 6.3 Pricing Schedule | 76. Three rates are required.  One rate for the base period, commencement date through 8/31/2019. A second rate for Option Period One (9/1/2019 – 8/31/2021).  A third rate for Option Period Two (9/1/2021 – 8/31/2023). |
| 77. Are detailed Staffing Salaries and Benefits requested for each individual position? For example, if the staffing included three registered nurse Full Time Equivalents (FTEs) covered by two FTE and two PT positions, is a line being requested for each of the four individual employees, for each FTE separately or for all FTEs grouped together? Is this information for each of the base years and option years? Pg. 84    Appendix F- Program Budget And Staff Plan | 77. Complete all forms and provide all information as requested by each form for each contract period (base period, Option Period One and Option Period Two).  An Excel spreadsheet is included with this response.<br><br><br>Excel_Appendix F.xls |
| 78. Each location must complete Exhibit J.1. Please provide this exhibit since we cannot seem to locate one in this RFP. Pg. 86 - Appendix F Instructions | 78. RFP. Pg. 86 - Appendix F Instructions is revised to read: "…each location must complete an **Appendix F**…" |
| 79. Detailed corporate administrative cost information is requested including, possibly, information regarding salaries and benefits for individual employees. As a private company, the proposer does not disclose this information. Would an aggregate presentation of this information suffice? If a proposer does not routinely allocate non-personnel overhead | 79. Appendix F shall be completed in its entirety and in accordance with instructions provided. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| expenses (e.g. rent, utilities) to corporate administration functions in the ordinary course of its business, is an allocation of such costs proportional to personnel costs or headcount sufficient? Pg. 86 - Appendix F. Instructions for Indirect Costs | |
| 80. Will vendor be held harmless from suits filed by SVPs in the community who protest their loss of freedom? General | 80. OVSOM shall not indemnify a contractor. However, OVSOM will be working to provide clients with procedural safeguards to protect their right to due process before they are placed under the rules of any inpatient status. |
| 81. I'm a translator English/Spanish and I would like to know if I can apply or place a bid for my services. | 81. OVSOM does not currently have a published Request for Proposals for Spanish / English Interpreter services. |
| 82. How many SVP clients are currently civilly committed? | 82. The total number of civil commitment clients is 369. Out of this 369, 193 currently live in the community. |
| 83. What is the projected number of new SVP commitments for each of the next five years? | 83. In fiscal year 2014, 153 offenders were referred to the Special Prosecutions Unit for possible civil commitment; of those 43 were committed to the civil commitment program. Please note; however, that the Special Prosecutions Unit only had a budget to conduct 50 civil commitment trials per year. The new civil commitment law, SB 746, upon becoming effective, does not limit the number of civil commitment trials and requires that offenders be returned to their last county of conviction for a decision whether to move forward with a civil commitment trial. As a result of this change in the civil commitment law, projections for the next five years cannot be provided. |
| 84. Please clarify the number of program tiers envisioned by OVSOM, the definition of each tier, and the projected population of each tier based on the current SVP population. | 84. The contractor shall propose a tiered program, to include the number of tiers and the definition of each tier. Currently, the OVSOM has 95 clients in level one, which would be considered the most restrictive level, or tier 1. |

**Civil Commitment Center for Violent Sex Offenders**
**Responses to Vendors' Questions**

| | |
|---|---|
| 85. Please clarify whether the treatment provider or OVSOM designates movement between program tiers. | 85. A treatment team, which includes one employee from contractor staff, will make a recommendation to OVSOM management. OVSOM management will make the final determination. |
| 86. Please confirm that OVSOM envisions the Civil Commitment Center as a secure treatment center with a therapeutic mission rather than a detention center that merely provides confinement. | 86. Confirmed. The OVSOM requires a secure civil commitment center with a therapeutic mission. |
| 87. The RFP and proposed legislation refer to tiers. Do the tiers apply within total confinement or solely to the transition to a less restrictive alternative? | 87. The tiers apply to the entire program, including within total confinement. To clarify further, the OVSOM envisions a secure facility with tiers built into the housing and treatment structure or design. |
| 88. Request for an extension on the time to deliver the notices required in 3.14.2. | 88. We will not provide an extension on the time to deliver the notices required in 3.14.2. |

# Vendor Conference Sign-In Sheets

Vendor Conference
Sign-In Sheets.PDF

Gerard Metzer

## Texas Civil Commitment Office
### Resident
## Monthly Income & Expense Worksheet

**Monthly Income:**

Gross Monthly Income:        $ 1,531.⁰⁰    Current Savings:  $ 8,000.⁰⁰

Source(s) of income : military Retirement

100.⁰⁰ Taxes

Net Monthly Income:
(take home pay after taxes)         $ 1431.⁰⁰

Monthly Child Support Payments:

(Court Order Required)              $ -0-               472.23

Total Monthly Adjusted Income:      $ 1431.⁰⁰ X 0.33 =  $ 505.³³

Source of income includes but is not limited to employment, SSI, interest on bank account, money provided as a gift, proceeds from the sale of property, etc.

**Monthly Expenses:**

Commissary (TCCC clients only):           $   300.⁰⁰

Resident Phone (TCCC clients only):       $   -0-

Cell phone (if approved):                 $   -0-

Additional expenses (please list): Property taxes on property   $   500.⁰⁰
in Pennsylvania ; truck insurance ; electric
bill on house in Pennsylvania

Total monthly expenses:                   $

Total after expenses to be placed in savings:   $

Pursuant Health & Safety Code §841.084, residents are responsible for payment for services for GPS, treatment & housing and will be calculated at 33.3% of the total monthly adjusted income.

_____
Client's Signature

11-24-2015
Date

_____
Case Manager's Signature

11/24/2015
Date

Dist:  Central Office File
       Client File
       Scan into CSS
       Client

TCCO-0116
9/2015

**CORRECT CARE, LLC**
**RESIDENT TRUST FUND**
2600 SOUTH SUNSET AVENUE
LITTLEFIELD, TX 79339

AIMBANK
LITTLEFIELD, TEXAS
88-2106/1113

2113

DATE ___ **January 14, 2016**

PAY TO THE
ORDER OF ___ TEXAS CIVIL COMMITMENT OFFICE ___ $ ___ 472.33

Four Hundred Seventy Two and 33/100 _____ **DOLLARS**

TWO SIGNATURES REQUIRED

_____

MEMO   TCCO MONTHLY FEES                              AUTHORIZED SIGNATURE

⑈002113⑈ ⑇111321063⑇ ⑈ 117501⑈

---

CORRECT CARE, LLC

Check Date:  January 14, 2016                           Check #:  2113

Payee:  TEXAS CIVIL COMMITMENT OFFICE

Amount:    $ 472.33

Memo:  TCCO MONTHLY FEES

Transaction:  WDRAWAL CHECK

Resident Name:  MATZEN, GERARD NEIL

Inmate Number:  06108999

---

CORRECT CARE, LLC                                        2113

Check Date:  January 14, 2016                           Check #:  2113

Payee:  TEXAS CIVIL COMMITMENT OFFICE

Amount:    $ 472.33

Memo:  TCCO MONTHLY FEES

Transaction:  WDRAWAL CHECK

Resident Name:  MATZEN, GERARD NEIL

Inmate Number:  06108999

Inmate Signature: _____  Date: _____

Officer Signature: _____  Date: C2

WHITCO CHECKS - AMARILLO

*Exhibit "E"*

**CORRECT CARE, LLC**
**RESIDENT TRUST FUND**
2600 SOUTH SUNSET AVENUE
LITTLEFIELD, TX 79339

AIMBANK
LITTLEFIELD, TEXAS
88-2106/1113

2193

DATE _____ February 08, 2016

PAY TO THE
ORDER OF   TEXAS CIVIL COMMITMENT OFFICE _____ $   472.23

Four Hundred Seventy Two and 23/100 _____ DOLLARS

TWO SIGNATURES REQUIRED

MEMO   TCCO MONTHLY FEES

AUTHORIZED SIGNATURE

⑈002193⑈ ⑆111321063⑆ ⑈ 117501⑈

---

CORRECT CARE, LLC

Check Date:  February 08, 2016                     Check #:  2193

Payee:  TEXAS CIVIL COMMITMENT OFFICE

Amount:      $ 472.23

Memo:  TCCO MONTHLY FEES

Transaction:  WDRAWAL CHECK

Resident Name:  MATZEN, GERARD NEIL

Inmate Number:  06108999

---

CORRECT CARE, LLC                                       2193

Check Date:  February 08, 2016                     Check #:  2193

Payee:  TEXAS CIVIL COMMITMENT OFFICE

Amount:      $ 472.23

Memo:  TCCO MONTHLY FEES

Transaction:  WDRAWAL CHECK

Resident Name:  MATZEN, GERARD NEIL

Inmate Number:  06108999

PAYMENT RECORD

Inmate Signature:_____ Date:_____

Officer Signature:_____ Date:_____

WHITCO CHECKS - AMARILLO

*EXHIBIT "F"*

## THE TEXAS PHOTO IDENTIFICATION LAW

### A. The Challenged Provisions of SB 14

Effective January 1, 2012, Texas registered voters are required to present a specified type of photo ID when voting at the polls in person. SB 14, § 26 (effective date). The law has a number of provisions placed in issue in this case, described generally as follows.

The only acceptable forms of photo ID are: (1) a driver's license, personal ID card, and license to carry a concealed handgun, all issued by the Department of Public Safety (DPS); (2) a United States military ID card containing a photo; (3) a United States citizenship certificate containing a photo; and (4) a United States passport. *Id.*, § 14. All of these forms of photo ID must be current or, if expired, they must not have expired earlier than sixty days before the date of presentation at the polls. *Id.*

If a voter does not have such photo ID, that voter may obtain an election identification certificate (EIC), which is issued by DPS upon presentation of proof of identity. *Id.*, § 20. Persons with a verifiable disability may obtain an exemption from the photo ID requirement, but must provide required documentation of the disability to the voter registrar. *Id.*, § 1. The sources of that documentation are limited to the United States Social Security Administration and United States Department of Veterans Affairs. *Id.*

When the voter appears at the polling place, the law requires that the voter's registered name and name on the photo ID be exactly the same or "substantially similar." *Id.*, § 9(c). If they are exactly the same, the voter may cast a ballot without further complication. If they are not exactly alike, but are deemed by the poll workers to be "substantially similar" under the SOS's guidelines, the voter is permitted to vote, but must first sign an affidavit that the actual voter and the registered voter are one and the same. *Id.*

If the registered name and the name on the photo ID are not deemed by the poll workers to be "substantially similar," or if the voter does not have any of the necessary photo ID, the voter may cast a provisional ballot, which will be counted only if the voter, within six days of the election, goes to the voter registrar with additional documentation to verify his or her identity. *Id.*, §§ 15, 17, 18. Those who have a religious objection to being photographed or who lost their photo ID in a natural disaster may also cast a provisional ballot subject to later proof of identity within six days of any election in which that person votes. *Id.*, § 17.

The law requires each county voter registrar to provide notice of the photo ID law when issuing original or renewal registration certificates. *Id.*, § 3. The registrar must post a notice in a prominent location at the county clerk's office and include notice in any website maintained by that registrar. *Id.*, § 5. The SOS is required to include the notice of this law on the SOS website and must conduct a statewide effort to educate voters regarding the new requirements. *Id.*, § 5. The SOS must also issue training standards for poll workers regarding accepting and handling the photo IDs. *Id.*, § 6. The county clerks are directed to provide training pursuant to the SOS's standards for their respective poll workers. *Id.*, § 7.

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Exhibit "G"*

## § 82.004. Confinement in Jail.

(a)  A qualified voter is eligible for early voting by mail if, at the time the voter's early voting ballot application is submitted, the voter is confined in jail:

(1) serving a misdemeanor sentence for a term that ends on or after election day;

(2) pending trial after denial of bail;

(3) without bail pending an appeal of a felony conviction; or

(4) pending trial or appeal on a bailable offense for which release on bail before election day is unlikely.

(b)  A voter confined in jail who is eligible for early voting is not entitled to vote by personal appearance unless the authority in charge of the jail, in the authority's discretion, permits the voter to do so.

(Enacted by Acts 1985, 69th Leg., ch. 211 (S.B. 616), § 1, effective January 1, 1986; am. Acts 1987, 70th Leg., ch. 472 (H.B. 612), § 19, effective September 1, 1987; am. Acts 1991, 72nd Leg., ch. 203 (S.B. 1234), § 1.02, effective September 1, 1991; am. Acts 1991, 72nd Leg., ch. 554 (S.B. 1186), § 1, effective September 1, 1991; am. Acts 1997, 75th Leg., ch. 864 (H.B. 1603), § 70, effective September 1, 1997.)

### STATUTORY NOTES

### REVISORS' NOTE.

No substantive change.

**Editor's note.-**  A former § 82.004, Religion, was deleted by Acts 1991, 72nd Leg., ch. 203 (S.B.

TXCODE                                                1

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

# Application for Ballot by Mail (Please print information)

Prescribed by the Office of the Secretary of State of State of Texas
AS-15e 09/15
1/23/11

**1** Last Name | First Name | Suffix (Jr., Sr., III, etc) | Middle Initial

For Official Use Only
VUID # / County Election Precinct #
Statement of Residence, etc.

**2** Residence Address: See back of this application for instructions.

City | , TX | Zip Code

**3** Mail my ballot to: If mailing address differs from residence address, please complete Box # 7.

City | State | Zip Code

**4** Date of Birth (mm/dd/yyyy) (Optional)

**5** Reason for Voting by Mail:
- [ ] 65 years of age or older. **(Complete Box #6a)**
- [ ] Disability. **(Complete Box #6a)**
- [ ] Expected absence from the county **(Complete Box #8 and Box #9)**
  You will receive a ballot for the upcoming election **only**.
- [ ] Confinement in Jail. **(Complete Box #6b)**
  You will receive a ballot for the upcoming election **only**.

**6a** ONLY Voters 65 Years of Age or Older or Voters with a Disability:
If applying for one election, select appropriate box.
If applying once for county elections in the calendar year, select "Annual Application."
- [ ] Annual Application

Primary Elections:
You must declare **one** political party to vote in a primary.

Uniform and Other Elections:
- [ ] May Election
- [ ] November Election
- [ ] Other _____
  - [ ] Democratic Primary
  - [ ] Republican Primary
  - [ ] Any Resulting Runoff

**6b** ONLY Voters Absent from County and Voters Confined in Jail:
You may only apply for a ballot by mail for one election, and any resulting runoff.
Please select the appropriate box.

Primary Elections:
You must declare **one** political party to vote in a primary.

Uniform and Other Elections:
- [ ] May Election
- [ ] November Election
- [ ] Other _____
  - [ ] Democratic Primary
  - [ ] Republican Primary
  - [ ] Any Resulting Runoff

**7** If you are requesting this ballot be mailed to a different address (other than residence), indicate where the ballot will be mailed. See reverse for instructions.
- [ ] Mailing Address as listed on my voter registration certificate
- [ ] Nursing home, assisted living facility, or long term care facility
- [ ] Hospital
- [ ] Retirement Center
- [ ] Address of the jail
- [ ] Relative, relationship _____
- [ ] Address outside the county (see Box #6)

**8** If you selected "expected absence from the county," see reverse for instructions

Date you can begin to receive mail at this address

Date of return to residence address

Notice to Voter: Effective September 1, 2015, you may submit a completed, signed and scanned application to the early voting clerk at _____ (early voting clerk's e-mail address)

**9** Contact Information (Optional)*
Please list phone number and/or email address
* Used if we have voting clerk/clerk/office questions

**10** "I certify that the information given in this application is true, and I understand that giving false information in this application is a crime."

SIGN HERE
If applicant is unable to sign or make a mark in the presence of a witness, the witness shall complete Box #11.

Date

**11** See back for Witness and Assistant definitions.

If applicant is unable to mark Box #10 and you are acting as a Witness to the fact, please check this box and sign below. [ ]

If you assisted the applicant in completing this application in the applicant's presence or e-mailed/mailed or faxed the application on behalf of the applicant, please check this box as an Assistant and sign below.
*If you are acting as Witness **and** Assistant, please check **both** boxes. Failure to complete this information is a Class A misdemeanor if signature was witnessed or applicant was assisted in completing the application.

Signature of Witness /Assistant

Printed Name of Witness/Assistant

Street Address | Apt Number (if applicable) | City

State | Zip

Witness' Relationship to Applicant:
(Refer to instructions on back for clarification)

The person who helped you to complete this form or mail the form for you (an interpreter) must complete the sections below.

Esto formulario está disponible en Español. Para conseguir la version en Español favor de llamar sin cargo al 1.800.252.8683 a la oficina del Secretario de Estado o la Secretaría de Votación por Adelantado.

FEB 23 2016 (Returned
this matter)

FEB 29 2016

CLERK, U.S. DIST. COURT
NORTHERN DISTRICT OF TEXAS

CLERK OF COURT
U.S. DISTRICT COURT N.D
LUBBOCK DIVISION
1205 TEXAS AVE RM 209
LUBBOCK, TX 79401



U.S. POSTAGE
PAID
LITTLEFIELD, TX
79339
FEB 26 16
AMOUNT
$0.00
R2304P11921 2-02

1000
79401



PURPLE HEART
FOREVER USA

USPS